# UNITED STATES DISTRICT COURT

## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| GERALD JOSEPH LOVOI, derivatively on behalf of CVS HEALTH CORPORATION, | Case No. |
| Plaintiffs, | |
| v. | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS AND BREACH OF FIDUCIARY DUTY |
| FERNANDO AGUIRRE, MARK T. BERTOLINI, RICHARD M. BRACKEN, C. DAVID BROWN II, ALECIA A. DECOUDREAUX, NANCY-ANN M. DEPARLE, DAVID W. DORMAN, ROGER N. FARAH, ANNE M. FINUCANE, ROBERT O. KRAFT, EDWARD J. LUDWIG, LARRY J. MERLO, JEAN-PIERRE MILLON, MARY L. SCHAPIRO, RICHARD J. SWIFT, WILLIAM C. WELDON, TONY L. WHITE, | JURY TRIAL DEMANDED |
| Defendants, | |
| -and- | |
| CVS HEALTH CORPORATION, a Delaware Corporation, | |
| Nominal Defendant. | |

Page 1 –COMPLAINT

Plaintiff Gerald Joseph Lovoi ("Plaintiff"), derivatively on behalf of CVS Health Corporation ("CVS" or the "Company"), brings the following Stockholder Derivative Complaint (the "Complaint") against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Anarkat v. CVS Health Corp. et al*, Case No. 1:19-cv-00437 (D.R.I.) and *Waterford Township Police & Fire Ret. Sys. v. CVS Health Corporation et al*, Case No. 1:19-cv-00434 (D.R.I.); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff, a stockholder of CVS, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least February 9, 2016 and February 28, 2019. During that time the Defendants (as defined herein) caused or allowed CVS to issue or make materially false and misleading statements concerning the Company's financial condition and business operations. Additionally, the Defendants caused or allowed CVS to file false and misleading statements with the SEC.

2.     On May 21, 2015, CVS announced that it had entered into a definitive agreement to acquire Omnicare for $98.00 per share in cash, with a total transaction value of $12.7 billion (including $2.3 billion in debt). In announcing the transaction, the Company stated that it expected "to achieve significant purchasing and revenue synergies as well as operating efficiencies" from the acquisition and would "continue to have a solid balance sheet." The Omnicare transaction

1    closed on August 18, 2015.

2        3.      Between February 9, 2016 and February 20, 2019, the Defendants caused the

3    Company to make false and misleading statements concerning the performance of Omnicare's

4    long-term care ("LTC") business. In press releases and Forms 10-Q and 10-K, the Company failed

5    to disclose the financial performance of the LTC business. There were no disclosures concerning

6    customer losses in the LTC business, or how synergies impacted customer retention, or even how

7    the financial performance of the LTC business impacted the Company's financial performance.

8        4.      On August 8, 2018, the Company filed a Form 10-Q with the SEC that discussed

9    challenges in the LTC business, such as lower client retention rates and a forecasted deterioration

10   in financial results in 2018 and 2019. The challenges led to a goodwill impairment charge of $3.9

11   billion. On February 20, 2019, the Company issued a press release disclosing financial results for

12   the fourth quarter and full year 2018. The press release disclosed a new goodwill impairment

13   charge of $2.2 billion, linked to the financial results of the LTC business. The new impairment

14   charge lowered the goodwill from the Omnicare acquisition to approximately $431 million, a 95%

15   drop from the $9 billion CVS determined that it had obtained when it acquired Omnicare. Even

16   still, the Company did not disclose information about customer losses, synergies, or how the LTC

17   business impacted the Company's financial performance.

18        5.      CVS's false and misleading statements have damaged the company. Between

19   January 2, 2018 and March 6, 2019, CVS's stock dropped 26.5%, a loss of $25.3 billion in market

20   share. In addition, the false and misleading statements have subjected CVS to two securities class

21   actions, *Anarkat v. CVS Health Corp. et al*, Case No. 1:19-cv-00437 (D.R.I.) and *Waterford*

22   *Township Police & Fire Ret. Sys. v. CVS Health Corporation et al*, Case No. 1:19-cv-00434

23   (D.R.I.), that assert that statements made between February 9, 2016 and February 20, 2019 were

24

Page 3 –COMPLAINT

false and misleading and/or failed to disclose the performance of the LTC business. The lawsuits expose CVS to millions of dollars in legal fees and potential damages. Finally, the misconduct has damaged CVS's credibility and reputation.

6.     Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

7.     Plaintiff Gerald Joseph Lovoi is a current stockholder of CVS and has continuously held CVS stock during all times relevant hereto. Plaintiff is committed to retaining CVS shares through the pendency of this action to preserve his standing.  Plaintiff is a longstanding holder of shares of CVS.   Plaintiff will adequately and fairly represent the interests of CVS and its stockholders in enforcing its rights.

### B. Nominal Defendant

8.     Nominal Defendant CVS is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at One CVS Drive, Woonsocket, Rhode Island, 02895.

### C. Individual Defendants

9.     Defendant Larry J. Merlo has served as President and a director of the Company since 2010, and has been CEO of the Company since 2011.

10.     Defendant Eva C. Boratto has served as Executive Vice President and CFO of the Company since 2018.

Page 4 –COMPLAINT

11.     Defendant David M. Denton served as the Company's Executive Vice President and CFO from 2010 to 2018.

12.     Defendant Jonathan C. Roberts has served as the Company's Executive Vice President and COO since March 2017.

13.     Defendant Robert O. Kraft served as EVP of CVS and President – Omnicare from August 2015 to October 2017. Kraft had previously served as Senior Vice President and CFO of Omnicare from 2012 to 2015.

14.     Defendant Fernando Aguirre has been a director of the Company since 2018. Defendant Aguirre joined the Audit Committee in November 2018.

15.     Defendant Mark T. Bertolini has been a director of the Company since 2018.

16.     Defendant Richard M. Bracken has been a director of the Company since 2015.

17.     Defendant C. David Brown II has been a director of the Company since 2007.

18.     Defendant Alecia A. DeCoudreaux has been a director of the Company since 2015. Defendant DeCoudreaux is a member of the Audit Committee.

19.     Defendant Nancy-Ann M. DeParle has been a director of the Company since 2013.

20.     Defendant David W. Dorman has been a director of the Company since 2006. Defendant Dorman also serves as Chair of the Board.

21.     Defendant Roger N. Farah has been a director of the Company since 2018.

22.     Defendant Anne M. Finucane has been a director of the Company since 2011.

23.     Defendant Edward J. Ludwig has been a director of the Company since 2018. Defendant Ludwig is a member of the Audit Committee, having joined in November 2018.

24.     Defendant Jean-Pierre Millon has been a director of the Company since 2007. Defendant Millon is a member of the Audit Committee.

Page 5 –COMPLAINT

25.     Defendant Mary L. Schapiro has been a director of the Company since 2017. Mary Schapiro is a member of the Audit Committee.

26.     Defendant Richard J. Swift has been a director of the Company since 2006. Defendant Swift is Chair of the Audit Committee.

27.     Defendant William C. Weldon has been a director of the Company since 2013.

28.     Defendant Tony L. White has been a director of the Company since 2011.

29.     Defendants Merlo, Boratto, Denton and Roberts are herein referred to as "Officer Defendants."

30.     Defendants Aguirre, Bertolini, Bracken, Brown, DeCoudreaux, DeParle, Dorman, Farah, Finucane, Ludwig, Merlo, Millon, Schapiro, Swift, Weldon and White are herein referred to as "Director Defendants."

## JURISDICTION AND VENUE

31.     This court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because plaintiff's claims arise under Section 14(a) of the Exchange Act. This court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

32.     This court has personal jurisdiction over each defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because CVS conducts regular, sustained business activity in this District and a substantial amount of the wrongs complained of herein occurred in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.    Company Background

34.    CVS provides pharmacy and health services throughout the United States. As of December 31, 2018, CVS had more than 9,900 retail locations, 1,100 walk-in medical clinics, numerous specialty pharmacy services, and total revenues of $194.5 billion.

35.    On May 21, 2015, CVS announced that it had entered into a definitive agreement to acquire Omnicare for $98.00 per share in cash, with a total transaction value of $12.7 billion (including $2.3 billion in debt). In announcing the transaction, the Company stated that it expected "to achieve significant purchasing and revenue synergies as well as operating efficiencies" from the acquisition and would "continue to have a solid balance sheet." The Omnicare transaction closed on August 18, 2015.

36.    In its Form 10-Q filed with the SEC on October 30, 2015, the Company called Omnicare's LTC business "the nation's largest provider of pharmaceuticals, related pharmacy consulting and other ancillary services to chronic care facilities." The Form 10-Q further stated that CVS acquired Omnicare "to expand its operations in dispensing prescription drugs to assisted-living and long-term care facilities, and to broaden its presence in the specialty pharmacy business as the Company seeks to serve a greater percentage of the growing senior patient population in the United States." In a press release issued October 30, 2015, the Company noted that its Pharmacy Services Segment would include Omnicare's specialty pharmacy Advanced Care Scripts, while

the Retail Pharmacy Segment would include Omnicare's LTC operations, as well as Omnicare's commercialization services (RxCrossroads), supply chain solutions and patient support services. The Retail Pharmacy segment was renamed the "Retail/LTC Segment." The LTC operations include distributing pharmaceutical products, related pharmacy consulting and other ancillary services to chronic care facilities and other care settings.

**B.     CVS's False and Misleading Statements**

37.      Between October 30, 2015 and February 28, 2019, Defendants caused the Company to make false and misleading statements concerning the successful integration of Omnicare. These statements failed to disclose the financial performance of the Omnicare assets, as well as issues with synergies and customer retention.

**a.     False and Misleading Statements Concerning Omnicare's Financial Performance**

38.      The Company touted the Omnicare acquisition when financial results were positive, but the Omnicare assets were not mentioned when the reverse was true. In a press release issued on October 30, 2015, the Company stated: "Revenues in the Retail/LTC Segment increased 6.9%, or $1.2 billion, to $17.9 billion in the three months ended September 30, 2015. Approximately half of the increase was driven by the addition of LTC operations acquired as part of the Omnicare acquisition in August 2015." Overall, net revenues increased 10.3% to $38.6 billion compared to third quarter of 2014, and revenues in the Pharmacy Services segment increased 13.3% to $25.5 billion. The increase was primarily driven by growth in specialty pharmacy and pharmacy network claims." Operating profits increased for both the Pharmacy Services segment and the Retail/LTC segment. According to the Company, "[b]oth [the Pharmacy Services and Retail/LTC] segments benefited from the Omnicare acquisition, increased generic

drugs dispensed and favorable purchasing economics."

39.    These statements were echoed in the Form 10-Q filed with the SEC on October 30, 2015. The Company noted both the Pharmacy Services and Retail/LTC segments "benefited from the Omnicare acquisition" in terms of an increase in net revenues. Furthermore, "[t]he increase in gross profit dollars was primarily driven by the addition of LTC, same store sales and new store sales, as well as favorable purchasing economics, partially offset by continued reimbursement pressure" while an increase in pharmacy revenues as a percentage of total revenues "was due to pharmacy revenues growing faster than front store revenues, as well as the acquisition of Omnicare."

40.    In the press release issued on February 9, 2016 concerning CVS's financial results for fourth quarter and full year 2015, the Company again touted the positive impact of the Omnicare acquisition on the Company's financial performance. For example, the press release noted that revenues in the Pharmacy Services segment increased in the fourth quarter of 2015, which was "primarily driven by growth in specialty pharmacy, which includes the impact of the [Omnicare acquisition], and pharmacy network claims." Similarly, approximately half of the increased revenues in the Retail/LTC segment was "driven by the addition of [LTC] operations acquired as part of the Omnicare acquisition." And both the Pharmacy Services and Retail/LTC segments "benefited from the Omnicare acquisition" in terms of increased operating profit."

41.    The Form 10-K filed with the SEC on February 9, 2016 repeated these statements. "Both [the Pharmacy Services and Retail/LTC] segments benefited from the Omnicare acquisition" in terms of increased net revenues. Increased net revenues in the Pharmacy Services segment was "primarily due to growth in specialty pharmacy, driven by new clients, increased volume from new products and the addition of the specialty pharmacy operations of Omnicare, as

1    well as inflation and increased pharmacy network claims." Similarly, increased net revenues in the

2    Retail/LTC segment were "primarily driven by the acquisition of Omnicare, a same store sales

3    increase of 1.7%, and net revenues from new and acquired stores." Gross profits in the Retail/LTC

4    segment increased as well, "primarily driven by the addition of LTC, same store sales and new

5    store sales, increased generic dispensing, as well as favorable purchasing economics, partially

6    offset by continued reimbursement pressure."

7        42.    The Company continued to attribute positive financial results to Omnicare in the

8    first quarter of 2016. In a press release issued on May 3, 2016 concerning the financial results for

9    first quarter 2016, the Company stated: "Revenues in the Retail/LTC Segment increased 18.6%,

10   or $3.2 billion, to $20.1 billion, in the three months ended March 31, 2016. The increase was

11   primarily driven by the addition of the [LTC] operations acquired as part of the acquisition of

12   [Omnicare], the addition of the pharmacies and clinics of Target Corporation ("Target") acquired

13   in December 2015 and pharmacy same store sales growth." And as with previous statements, the

14   press release noted that "[b]oth [the Pharmacy Services and Retail/LTC] segments benefited from

15   the Omnicare acquisition and increased generic drugs dispensed."

16       43.    The positive impact of the Omnicare acquisition was also touted in the Form 10-Q

17   filed with the SEC on May 3, 2016. Increased net revenues in the Pharmacy Services segment

18   were "primarily driven by growth in increased volume in pharmacy network claims and growth in

19   specialty pharmacy, including the addition of ACS which was acquired through the Omnicare

20   acquisition in August 2015." Increased net revenues in the Retail/LTC segment were "primarily

21   due to the addition of LTC and the pharmacies and clinics of Target, as well as increased pharmacy

22   same store sales." Gross profits were "positively affected by an increase in generic dispensing

23   rates, as well as volume from the acquisitions of Omnicare and the pharmacies and clinics of Target

24

Page 10 –COMPLAINT

compared to the prior year."

44.     On August 2, 2016, the Company issued a press release concerning CVS's financial results for the second quarter of 2016. Again, the Company pointed to the Omnicare acquisition as contributing to CVS's positive financial results. For example, the press release noted that an increase in revenues in the Retail/LTC segment was "primarily driven by the addition of the [LTC] pharmacy operations acquired as part of the acquisition of [Omnicare], the addition of the pharmacies and clinics of Target Corporation ("Target") acquired in December 2015 and pharmacy same store sales growth." And "[b]oth [the Pharmacy Services and Retail/LTC] segments benefited from the Omnicare acquisition and increased generic drugs dispensed" in terms of operating profit.

45.     As in previous months, the Form 10-Q filed with the SEC on August 2, 2016 repeated Omnicare's positive contribution to the Company. Net revenues increased, and "part of the increase was driven by the acquisitions of Omnicare in August 2015 and the pharmacies and clinics of Target in December 2015, which positively affected both [the Pharmacy Services and Retail/LTC] segments." Gross profits "were positively affected by an increase in generic dispensing rates, an increase in pharmacy network claims and specialty growth in the Pharmacy Services Segment compared to the prior year, as well as volume from the acquisitions of Omnicare and the pharmacies and clinics of Target." The Form 10-Q specified that net revenues in the Pharmacy Services segment increased "primarily due to increased pharmacy network claims, growth in specialty pharmacy, including the addition of [ACS] through the acquisition of Omnicare, and inflation, partially offset by increased generic dispensing and price compression," while gross profit for the Pharmacy Services segment increased "primarily due to growth in specialty pharmacy, including the addition of ACS, growth in Medicare Part D lives, higher

Page 11 –COMPLAINT

generic dispensing and favorable purchasing economics, partially offset by price compression." The Form 10-Q was blunt about Omnicare's impact on the Retail/LTC segment: "[n]et revenues [for Retail/LTC] were positively affected by the addition of LTC." An increase in gross profit was "primarily driven by the addition of LTC and the pharmacies and clinics of Target, as well as same store sales, partially offset by continued reimbursement pressure."

46.     Approximately one year after the Omnicare acquisition closed, the Company was still pointing to Omnicare as contributing to the Company's positive financial results. A press release issued on November 8, 2016 concerning CVS's third quarter 2016 financial results noted: "Revenues in the Retail/LTC Segment increased 12.5%, or $2.2 billion, to approximately $20.1 billion, in the three months ended September 30, 2016. The increase was primarily driven by the addition of the [LTC] pharmacy operations acquired as part of the acquisition of [Omnicare], the addition of the pharmacies and clinics of Target Corporation ("Target") acquired in December 2015 and pharmacy same store sales growth." The press release further noted that the Retail/LTC Segment was "also positively affected by the acquisition of the pharmacies and clinics of Target and the acquisition of Omnicare's LTC business as well as an improved front store margin rate."

47.     The Form 10-Q filed with the SEC on November 8, 2016 also asserted Omnicare's positive impact on CVS. "Part of the increase [in net revenues] was driven by the acquisition of Omnicare in August 2015, which positively affected both segments, and the pharmacies and clinics of Target in December 2015, which positively affected the Retail/LTC Segment." Gross profits "were positively affected by an increase in generic dispensing rates, an increase in pharmacy network claims and specialty growth in the Pharmacy Services Segment compared to the prior year, as well as volume from the acquisitions of Omnicare and the pharmacies and clinics of Target." The increase in net revenues in the Pharmacy Services segment was "primarily due to

Page 12 –COMPLAINT

increased pharmacy network claims, growth in specialty pharmacy, including the addition of [ACS] through the acquisition of Omnicare, and inflation, partially offset by increased generic dispensing and price compression." Net revenues [in the Retail/LTC segment] were "positively affected by the addition of LTC which was acquired in August 2015." And an increase in gross profits in the Retail/LTC segment was "primarily driven by the addition of the pharmacies and clinics of Target and LTC, as well as same store sales, partially offset by continued reimbursement pressure."

48.     The Company's tone began to change in 2017. In a press release issued on February 9, 2017 concerning CVS's fourth quarter and full year 2016 financial results, Omnicare and its assets were barely mentioned. In fact, the only time it is mentioned is to discuss an increase in integration costs.

49.     The Form 10-K filed with the SEC on February 9, 2017 lists risks related to the Omnicare assets for the first time:

***Risks of declining gross margins in the PBM, retail pharmacy and LTC pharmacy industries.***

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, increased revenue sharing, enhanced service offerings and/or higher service levels. In that regard, we maintain contractual relationships with generic pharmaceutical manufacturers and brand name pharmaceutical manufacturers that provide for purchase discounts and/or rebates on drugs dispensed by pharmacies in our retail network and by our specialty and mail order pharmacies (all or a portion of which may be passed on to clients). Manufacturer rebates often depend on a PBM's ability to meet contractual market share or other requirements, including in some cases the placement of a manufacturer's products on the PBM's formularies. If we lose our relationship with one or more pharmaceutical manufacturers, or if the discounts or rebates provided by pharmaceutical manufacturers decline, our business and financial results could be adversely affected. Further, competitive pressures in the PBM industry have resulted in our clients sharing in a larger portion of rebates and/or discounts received from pharmaceutical manufacturers. Market dynamics and regulatory changes have impacted our ability to offer plan sponsors pricing that includes the use of retail "differential" or "spread", which could negatively impact our future

profitability. Further, changes in existing federal or state laws or regulations or the adoption of new laws or regulations relating to patent term extensions, purchase discount and rebate arrangements with pharmaceutical manufacturers, or to formulary management or other PBM services could also reduce the discounts or rebates we receive. In addition, changes in federal or state laws or regulations or the adoption of new laws or regulations relating to claims processing and billing, including our ability to use MAC lists and collect transmission fees, could adversely impact our profitability.

Our retail pharmacy, specialty pharmacy and LTC pharmacy operations have also been affected by the margin pressures described above, including client demands for lower prices, generic pricing and network reimbursement pressure. In addition, as competition increases in the markets in which we operate, a significant increase in general pricing pressures could occur, and this could require us to reevaluate our pricing structures to remain competitive. A shift in the mix of our pharmacy prescription volume towards programs offering lower reimbursement rates could adversely affect our margins, including the shift in pharmacy mix towards 90-day prescriptions at retail and the shift in pharmacy mix towards Medicare Part D prescriptions.

Finally, the margins of our LTC business are further affected by the increased efforts of health care payors to negotiate reduced or capitated pricing arrangements. These actions could also adversely affect the margins of our LTC business.

In discussing an increase in net revenues, the Form 10-K notes that the "Retail/LTC Segment benefited from the 2015 acquisitions of Omnicare and the pharmacies and clinics of Target." An increase in net revenues in CVS's Pharmacy Services was "primarily due to increased pharmacy network claims, growth in specialty pharmacy, including the growth in Medicare Part D, addition of ACS Pharmacy through the acquisition of Omnicare, and inflation, partially offset by increased generic dispensing and price compression." An increase in net revenues in CVS's Retail/LTC segment was "primarily driven by the acquisitions of the pharmacies and clinics of Target and new stores, which accounted for approximately 640 basis points of our total net revenue percentage increase during the year, the acquisition of Omnicare's LTC operations and a same store sales increase of 1.9%." For the Retail/LTC segment, the increase in gross profits was "primarily driven by the addition of the pharmacies and clinics of Target and LTC, as well as same store sales,

Page 14 –COMPLAINT

partially offset by continued reimbursement pressure." The percentage of revenues from pharmacies increased "due to pharmacy revenues growing faster than front store revenues, largely driven by the acquisitions of the pharmacies and clinics of Target and LTC."

50.     A press release issued on May 2, 2017 discussed CVS's first quarter 2017 financial results. The press release noted that revenues increased in the Pharmacy Services segment, but there was no mention of Omnicare. Revenues decreased for the Retail/LTC segment, and there was no mention of Omnicare.  The same is true for the Form 10-Q filed with the SEC on May 2, 2017. The Form 10-Q makes no mention of Omnicare in discussing the decreased revenues in the Retail/LTC segment. Instead, the Form 10-Q states that revenues and gross profits will be negatively impacted by a decrease in prescriptions and generic drugs: "Due to marketplace changes in the latter half of 2016, we continue expect prescription growth to be negatively impacted for the next several quarters by restricted network relationships that exclude CVS Pharmacy. Pharmacy revenues continue to be negatively impacted by the conversion of brand name drugs to equivalent generic drugs, which typically have a lower selling price."

51.     Financial results for CVS's second quarter of 2017 were discouraging, as well. A press release issued on August 8, 2017 noted that revenues in the Retail/LTC segment decreased, "largely driven by a 2.6% decrease in same store sales, an increase in the generic dispensing rate and continued reimbursement pressure." The press release also pointed to restricted networks that exclude CVS Pharmacy, "softer customer traffic and efforts to rationalize promotional strategies" for a decrease in sales. The only mention of anything related to Omnicare was a goodwill impairment charge of $135 million related to RxCrossroads. The Form 10-Q filed on August 8, 2017 described the goodwill impairment charge concerning RxCrossroads:

> During the second quarter of 2017, the Company pursued various strategic alternatives for its RxCrossroads ("RxC") reporting unit. In connection with this

ongoing effort, the Company performed an interim goodwill impairment test prior to the annual goodwill impairment test in the third quarter. In conjunction with the impairment test, the fair value of the RxC reporting unit was estimated to be lower than the carrying value resulting in a $135 million goodwill impairment charge within operating expenses. The fair value of the RxC reporting unit was determined using a combination of a discounted cash flow model and a comparable market transaction model. The Company also performed an impairment test of the intangible assets of the RxC reporting unit and none were impaired at June 30, 2017.

The Form 10-Q noted that net revenues increased in the third quarter of 2017, but the increase was attributable to the Pharmacy Services segment: "The increase is due to increases in the Pharmacy Services Segment partially offset by decreases in the Retail/LTC Segment." The decrease in net revenues for the Retail/LTC segment were blamed on "continued softer customer traffic and as promotional strategies continue to be rationalized," a decrease in prescriptions CVS stated were due to "marketplace changes that restrict CVS Pharmacy from participating in certain networks," and "the conversion of brand name drugs to equivalent generic drugs, which typically have a lower selling price." Gross profits decreased as well, "primarily driven by the continued reimbursement pressure and loss of prescriptions due to previously discussed network restrictions." There was no mention of Omnicare's role in the negative financial results.

52.     The trend continued in the third quarter of 2017. In a press release issued on November 6, 2017 concerning CVS's financial results in the third quarter 2017, Defendant Merlo stated: "The solid third quarter results we posted today keep us well on track to achieve our full-year targets. While operating profit in the Retail/LTC Segment was impacted by the devastating hurricanes, operating profit in the Pharmacy Services Segment was in line with expectations." Revenues increased in the Pharmacy Services segment, but as with the previous quarter revenues decreased in the Retail/LTC segment. According to the press release, "[t]he decrease was largely driven by a 3.2% decrease in same store sales, an increase in the generic dispensing rate and

Page 16 –COMPLAINT

continued reimbursement pressure." And as with the previous quarter, "restricted networks that exclude CVS Pharmacy," "softer customer traffic and efforts to rationalize promotional strategies and "continued reimbursement pressure" were blamed for the disappointing results.

53.    The Form 10-Q filed with the SEC on November 6, 2017 repeated these sentiments:

Net revenues increased approximately $1.6 billion, or 3.5%, and $4.8 billion, or 3.7%, in the three and nine months ended September 30, 2017, respectively, as compared to the prior year. The increase is due to increases in the Pharmacy Services Segment partially offset by decreases in the Retail/LTC Segment. The increase in the Pharmacy Services Segment was driven by growth in pharmacy network claim volume attributable to net new business, brand inflation and specialty pharmacy volume, partially offset by increased price compression and generic dispensing. The decrease in the Retail/LTC Segment was primarily due to a decline in same stores sales as a result of the previously-announced marketplace changes, which began to have an impact in the fourth quarter of 2016, that restrict CVS Pharmacy from participating in certain networks. The Retail/LTC Segment decrease was also due to continued reimbursement pressure and an increase in the generic dispensing rate. Generic prescription drugs typically have a lower selling price than brand name prescription drugs.

"[C]ontinued softer customer traffic" and "promotional strategies" were also blamed for lower same store sales, as was "the absence of leap day in the current year" in front store same store sales. The Form 10-Q also mentioned, for the first time, that the LTC business may have a valuation issue:

As previously discussed, the results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%. Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates. Our projected discounted cash flow model assumes future script growth from our senior living initiative and the impact of acquisitions. Such projections also include expected cost savings from labor productivity and other initiatives. Our market multiple method is heavily dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers. If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount.

Despite this, the Form 10-Q does not mention any issues with the financial performance of the LTC business or point to the LTC business for decreases in revenues in the Retail/LTC segment.

54.     On February 8, 2018, the Company issued a press release to announce CVS's financial results for its fourth quarter and full year 2017. Revenues in the Pharmacy Services segment increased in the fourth quarter of 2017, with an overall increase in revenues for the fiscal year. Revenues also increased in the Retail/LTC segment in the fourth quarter of 2017, "primarily driven by an increase in same store prescriptions of 2.5%, on a 30-day equivalent basis, and brand inflation, partially offset by an increase in the generic dispensing rate and continued reimbursement pressure." Yet net revenues in the Retail/LTC segment decreased overall in fiscal year 2017. The Company pointed to "restricted networks that exclude CVS Pharmacy," "recent generic introductions," and "softer customer traffic and efforts to rationalize promotional strategies" for the decrease. An increase in gross profits in the Retail/LTC segment was "offset" by a $46 million goodwill impairment for RxCrossroads. According to the press release, "this impairment was triggered by the Tax Cuts and Jobs Act (the "TCJA"), enacted in December 2017, which reduced the U.S. federal corporate income tax rate from 35% to 21%. As a result of this change in rates, RxCrossroads' deferred income tax liabilities decreased and its net assets increased. RxCrossroads was subsequently sold on January 2, 2018 below its net asset value."

55.     The Form 10-K filed with the SEC on February 14, 2018 highlighted risks in the LTC business that are disconnected from the described bases for the poor financial results. For example, the Form 10-K notes that there is a risk of declining gross margins in the LTC unit:

> ***Risks of declining gross margins in the PBM, retail pharmacy and LTC pharmacy industries.***
>
> The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, increased revenue sharing, enhanced service offerings and/or higher service levels. In that regard, we maintain

contractual relationships with generic pharmaceutical manufacturers and brand name pharmaceutical manufacturers that provide for purchase discounts and/or rebates on drugs dispensed by pharmacies in our retail network and by our specialty and mail order pharmacies (all or a portion of which may be passed on to clients). Manufacturer rebates often depend on a PBM's ability to meet contractual market share or other requirements, including in some cases the placement of a manufacturer's products on the PBM's formularies. If we lose our relationship with one or more pharmaceutical manufacturers, or if the discounts or rebates provided by pharmaceutical manufacturers decline, our business and financial results could be adversely affected. Further, competitive pressures in the PBM industry have resulted in our clients sharing in a larger portion of rebates and/or discounts received from pharmaceutical manufacturers. Market dynamics and regulatory changes have impacted our ability to offer plan sponsors pricing that includes the use of retail "differential" or "spread", which could negatively impact our future profitability. Further, changes in existing federal or state laws or regulations or the adoption of new laws or regulations relating to patent term extensions, purchase discount and rebate arrangements with pharmaceutical manufacturers, or to formulary management or other PBM services could also reduce the discounts or rebates we receive. In addition, changes in federal or state laws or regulations or the adoption of new laws or regulations relating to claims processing and billing, including our ability to use MAC lists and collect transmission fees, could adversely impact our profitability.

***Our retail pharmacy, specialty pharmacy and LTC pharmacy operations have also been affected by the margin pressures described above, including client demands for lower prices, generic pricing and network reimbursement pressure.*** In addition, as competition increases in the markets in which we operate, a significant increase in general pricing pressures could occur, and this could require us to reevaluate our pricing structures to remain competitive. A shift in the mix of our pharmacy prescription volume towards programs offering lower reimbursement rates could adversely affect our margins, including the shift in pharmacy mix towards 90-day prescriptions at retail and the shift in pharmacy mix towards Medicare Part D prescriptions. ***Finally, the margins of our LTC business are further affected by the increased efforts of health care payors to negotiate reduced or capitated pricing arrangements. These actions could also adversely affect the margins of our LTC business.***

The Form 10-K's discussion of gross profits does not include a discussion on the LTC business.

Similarly, the Form 10-K highlights the risk of losing clients:

***The possibility of client losses and/or the failure to win new business.***

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each

Page 19 –COMPLAINT

year. In some cases, however, PBM clients may negotiate a shorter or longer contract term or may require early or periodic renegotiation of pricing prior to expiration of a contract. Our clients are generally well informed and organized, can move between our competitors and often seek competing bids prior to expiration of their contracts. In addition, the reputational impact of a service-related incident could negatively affect our business. These factors, together with the impact of competitive pressures, could make it difficult for us to attract new clients, retain existing clients and cross-sell additional services. Further, the PBM industry has been affected by consolidation activity that may continue in the future. In the event one or more of our PBM clients is acquired by an entity that is not also our client, we may be unable to retain all or a portion of the acquired business. These circumstances, either individually or in the aggregate, could result in an adverse effect on our business and financial results. Therefore, we continually face challenges in competing for new PBM business and retaining or renewing our existing PBM business. ***With respect to our LTC business, reimbursement from skilled nursing facilities for prescriptions we dispense is determined pursuant to our agreements with those skilled nursing facilities. The termination of these agreements generally causes our ability to provide services to any of the residents of that facility to cease, resulting in the loss of revenue from any source for those residents.*** There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms.

Additionally, with respect to our retail and LTC pharmacy businesses, reimbursement under Medicare Part D, as well as reimbursement from certain private third-party payors, is determined pursuant to agreements that we negotiate with those payors or their pharmacy benefit manager representatives. The loss of those agreements, or a material change in the terms of those agreements, could negatively impact the Company. In addition, restricted networks that exclude our retail or specialty pharmacies negatively impact those businesses."

There is no discussion of terminated agreements or lost revenues stemming from the LTC business.

The Form 10-K notes that net revenues decreased for the Retail/LTC segment, but the Form 10-K states that it was "primarily due to a decline in same store sales of 2.6% as a result of the previously-announced marketplace changes that restrict CVS Pharmacy from participating in certain networks." Front store same store sales decreased, "primarily driven by softer customer traffic and efforts to rationalize promotional strategies." Pharmacy same store sales decreased as well, "due to recent generic introductions" and "from previously-discussed marketplace changes that restrict CVS Pharmacy from participating in certain networks." The only mention of the LTC

Page 20 –COMPLAINT

business was that pharmacy revenue growth "may be impacted by industry changes in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities." Similarly, while gross profits increased, the Form 10-K notes that "gross profit for 2017 and 2016 has been negatively impacted by price compression in the Pharmacy Services Segment and reimbursement pressure in the Retail/LTC Segment." The Form 10-K states that the "decrease in gross profit dollars in both Retail Pharmacy and LTC in the year ended December 31, 2017, was primarily driven by the continued reimbursement pressure as well as a loss of prescriptions in Retail Pharmacy due to previously discussed network restrictions."

56.     Things appeared to look up in 2018. In a press release issued on May 2, 2018 concerning CVS's financial results for its first quarter of 2018, the Company stated that net income had increased, as had operating profits. The Form 10-Q filed with the SEC on May 2, 2018 expanded on the positive results: "Net revenues increased approximately $1.2 billion, or 2.6% in the three months ended March 31, 2018, as compared to the prior year. The increase is due to increases in the both Pharmacy Services Segment and the Retail/LTC Segment. . . . The increase in the Retail/LTC Segment was primarily due to increased prescription volume and brand inflation, . . . ." The Form 10-Q pointed to "the shift of sales associated with the Easter holiday to the first quarter" and the "impact of seasonal cough and cold" for the increase. The only statement concerning results in the LTC business itself stated: "Pharmacy revenue growth has been impacted by industry changes in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities. Pharmacy revenue continued to benefit from our ability to attract and retain managed care customers, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care." Gross profits increased as well. According to the Form 10-Q, gross profits increased in the Retail/LTC segment because of "increased volume, improved

purchasing economics, and generic introductions . . ." The Form 10-K did not discuss issues in the LTC business as impacting revenues or profits. Yet in later section discussing goodwill, the Form 10-Q noted:

> Our LTC reporting unit continues to face challenges that may affect our ability to grow the business at the rate that we had originally estimated when we made the acquisition of Omnicare and when we performed our prior year annual goodwill impairment test. These challenges include customer reimbursement pressures, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and client retention rates. We recently made a number of additions and changes to our LTC management team to better respond to these challenges. Our financial projections assume future script growth from our senior living initiative, acquisitions, as well as cost savings from labor productivity and other initiatives. The estimated fair value of our LTC reporting unit is dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers. The estimated fair value is also dependent on the corporate income tax rate which was lowered from 35% to 21% as a result of the TCJA in December 2017, which had a positive impact on future cash flows and the estimated fair value. If we do not achieve our forecasts, given the small excess of fair value over the related carrying value in the prior year, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the goodwill of the LTC reporting unit could be deemed to be impaired by a material amount.

57.     While the Company tucked away concerns about the LTC business's prospects in the Form 10-K's section on goodwill, the August 8, 2018 press release issued concerning CVS's second quarter 2018 financial results discussed the LTC business outright. The press release stated:

> [CVS's] LTC business has continued to experience challenges that have impacted [CVS's] ability to grow the business at the rate that was originally estimated when the Company acquired Omnicare, Inc. in 2015. These challenges include lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures. Based on updated financial projections developed during the second quarter of 2018, management determined that there were indicators that the goodwill of the LTC business may be impaired, and accordingly, an interim goodwill impairment test was performed as of June 30, 2018. The results of the impairment test showed that the fair value of the LTC business was lower than the carrying value resulting in a $3.9 billion noncash pre-tax and after-tax goodwill impairment charge. In addition to the lower financial

projections, higher risk-free interest rates and lower market multiples of the peer group companies contributed to the amount of the goodwill impairment charge.

Despite this, the press release did not point to any of the named challenges as impacting the Company's or the Retail/LTC segment's financial results. The Form 10-Q filed with the SEC on August 8, 2018 10-Q also failed to mention the LTC business's challenges as impacting financial results. This is despite the Form 10-Q specifically stating: "In June 2018, LTC management submitted their initial budget for 2019 and updated their 2018 annual forecast *which showed a deterioration in the financial results for the remainder of 2018 and in 2019*, which also caused management to update their long term forecast beyond 2019." The Form 10-Q reports an increase in net revenues for both the Pharmacy Services and Retail/LTC segments. For the Retail/LTC segment, the Form 10-Q states that the increase in net revenues was "primarily due to increased prescription volume and brand inflation, partially offset by continued reimbursement pressure and the impact of recent generic introductions." The Form 10-Q noted that "Pharmacy revenue growth has been impacted by industry challenges in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities, as well as the deteriorating financial health of many skilled nursing facilities." But the next statement in the Form 10-Q is: "Pharmacy revenue continued to benefit from our ability to attract and retain managed care customers, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care." It is unclear, based on these statements, whether the LTC business is negatively or positively impacting revenues.

58.     The Company's statements concerning financial results for the third quarter of 2018 were no less confusing. The Form 10-Q filed with the SEC on November 6, 2018 stated:

During 2018, the LTC reporting unit has continued to experience challenges that have impacted management's ability to grow the business at the rate that was originally estimated when the Company made the acquisition of Omnicare, Inc. and

when the prior year annual goodwill impairment test was performed. These challenges include lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures. In June 2018, LTC management submitted their initial budget for 2019 and updated their 2018 annual forecast which showed a deterioration in the financial results for the remainder of 2018 and in 2019, which also caused management to update their long term forecast beyond 2019.

The challenges in the LTC business and deteriorating financial results were discussed as part of the Company's goodwill. But little of the LTC business's financial results or challenges were discussed in terms of the impact on the Company's financial results. For example, in discussing net revenues in the Retail/LTC segment, the Form 10-Q states: "Pharmacy revenue growth has been impacted by industry challenges in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities, as well as the deteriorating financial health of many skilled nursing facilities. Pharmacy revenue continued to benefit from our ability to attract and retain managed care customers, and the increased use of pharmaceuticals by an aging population as the first line of defense for health care." It is unclear, based on these statements, whether the LTC business is negatively or positively impacting revenues. In discussing decreases in gross profits, the Form 10-Q states: "pharmacy gross profit rates have been adversely affected by the efforts of managed care organizations, PBMs and governmental and other third-party payors to reduce their prescription drug costs, including the use of restrictive networks, as well as changes in the mix of our business within the pharmacy portion of the Retail/LTC Segment."

59.     The previous statements were false and misleading because they failed to disclose the financial health of the LTC business and the impact of the LTC business on the Company's financial results. Failing to disclose this information misled CVS stockholders and the public as to the strength of the LTC business and the Company's prospects.

**b. False and Misleading Statements Concerning the Impact of Synergies and**

Page 24 –COMPLAINT

1    **Customer Losses**

2       60.    Defendants caused the Company to make false and misleading statements

3  concerning the success of the LTC business. Specifically, Defendants failed to disclose that

4  synergies expected after the Omnicare acquisition caused the Company to lose customers, and that

5  the LTC business otherwise was losing customers en masse.

6       61.    In their amended complaint, plaintiffs in *City of Miami Fire Fighters' and Police*

7  *Officers' Ret. Trust and Int'l Union of Operating Engineers Pension Fund of Eastern Pennsylvania*

8  *and Delaware*, Case No. 19-cv-1725 (S.D.N.Y. 2019) spoke to at least 19 former CVS or

9  Omnicare employees who they identified as confidential witnesses. One confidential witness left

10  CVS to join an LTC customer and promptly fired CVS. Another confidential witness stated that

11  the St. Louis region of the LTC business lost 50% of its business between 2015 and 2019. Yet

12  another confidential witness stated that CVS lost 30% of its LTC business in South Florida in

13  2016. One LTC affiliate closed just 18 months after the Omnicare acquisition closed after losing

14  almost all of its clients. Members of management, including Defendant Kraft, were aware of

15  customer losses.

16       62.    The confidential witnesses also revealed that CVS implemented changes in the LTC

17  business via synergies that led to customer losses. Before the acquisition, Omnicare would send

18  multiple deliveries of pharmaceuticals a day to its customers. After the acquisition, CVS applied

19  its own delivery policy to LTC clients, which led to delays and eventual client losses. One

20  confidential witness stated that CVS implemented a system in the LTC business that prohibited

21  district managers from meeting with clients and channeled client communications to account

22  managers. The account managers are not as knowledgeable about the industry or clients as the

23  district managers, upsetting clients. CVS moved Omnicare's billing department into a centralized

24

billing department. This upset customers, as there were delays in determining if a product was covered and then delays in treatment, and no relationship with the person handling the bills. Ultimately, the changes drove away customers.

63.     The loss of customers and issues with synergies were known by members of management, as well as executive officers. Confidential witnesses stated that Defendant Kraft attended a meeting where a large LTC client stated that it was moving its business to other providers. Defendant Kraft received and had access to weekly operation reports from regional LTC sales staff. And Defendant Kraft reported to Defendants Merlo and Denton. In addition, CVS used SalesForce, a software program that allowed the LTC business to track the performance and status of its clients. The Defendants had access to that information, as well as sales data shared across the Company.

64.     The customer losses and the negative impact of synergies were not disclosed to CVS's stockholders or the public until the damage had been done. Even then, the Defendants disclosed the customer losses and synergies as issues impacting goodwill. Goodwill is the amount paid in an acquisition over the book value of the purchased company.[1] What constitutes goodwill varies; customer relations or intellectual property may be factors in determining goodwill. In the case of the Omnicare acquisition, the Company stated in its Form 10-Q filed with the SEC on October 30, 2015: "The goodwill represents future economic benefits expected to arise from the Company's expanded presence in the pharmaceutical care market, the assembled workforce acquired, expected purchasing and revenue synergies, as well as operating efficiencies and cost savings." CVS determined that it had obtained approximately $9 billion in goodwill when it acquired Omnicare, with $8.59 billion allocated to the Retail/LTC segment and $444 million

---

[1] "Goodwill Impairment Test: Understand the Basics," Investopedia, Aug. 4, 2015, https://www.investopedia.com/articles/professionals/080415/goodwill-impairment-test-understand-basics.asp.

Page 26 –COMPLAINT

allocated to the Pharmacy Services segment. Companies must perform annual goodwill impairment tests to determine if the value of the goodwill has changed in value.[2] That is, companies must determine if the stated value of goodwill is more than its fair market value. If so, the reduction in value must be stated as a loss on financial statements.

65.    The LTC business began losing customers soon after the Omnicare acquisition closed. Yet for years there were no disclosures on customer losses or issues with synergies. The Form 10-K filed with the SEC on February 9, 2016 discussed goodwill from the Omnicare acquisition generally:

> The goodwill represents future economic benefits expected to arise from the Company's expanded presence in the pharmaceutical care market, the assembled workforce acquired, expected purchasing and revenue synergies, as well as operating efficiencies and cost savings. Goodwill of $8.6 billion was allocated to the Retail/LTC Segment and the remaining goodwill of $0.5 billion was allocated to the Pharmacy Services Segment. . . . Intangible assets acquired include customer relationships and trade names of $3.9 billion and $74 million, respectively, with estimated weighted average useful lives of 19.1 and 2.9 years, respectively, and 18.8 years in total.

Notably, the Form 10-K discussed customer relationships as valued at $3.9 billion. Yet there was no discussion of any client losses at that time.

66.    It wasn't until a year later that the Company discussed customer losses in the LTC business. Still, the discussion focused on the risk of customer losses and failed to disclose data on customer losses up to that point. As stated in the Form 10-K filed with the SEC on February 9, 2017:

> ***The possibility of client losses and/or the failure to win new business.***
>
> <div align="center">*    *    *</div>
>
> With respect to our LTC business, reimbursement from skilled nursing facilities for prescriptions we dispense is determined pursuant to our agreements with those skilled nursing facilities. The termination of these agreements generally causes our

---

[2] *Id.*

Page 27 –COMPLAINT

ability to provide services to any of the residents of that facility to cease, resulting in the loss of revenue from any source for those residents. There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms. Additionally, with respect to our retail and LTC pharmacy businesses, reimbursement under Medicare Part D, as well as reimbursement from certain private third-party payors, is determined pursuant to agreements that we negotiate with those payors or their pharmacy benefit manager representatives. The loss of those agreements, or a material change in the terms of those agreements, could negatively impact the Company. In addition, restricted networks that exclude our retail or specialty pharmacies negatively impact those businesses.

In discussing goodwill acquired from the Omnicare acquisition, the Form 10-K states:

The goodwill represents future economic benefits expected to arise from the Company's expanded presence in the pharmaceutical care market, the assembled workforce acquired, expected purchasing and revenue synergies, as well as operating efficiencies and cost savings. . . . Intangible assets acquired include customer relationships and trade names of $3.9 billion and $74 million, respectively, with estimated weighted average useful lives of 19.1 and 2.9 years, respectively, and 18.8 years in total.

There was no other discussion of customer losses or issues with synergies.

67.    Later in 2017, the Company disclosed "client retention rates" and "expected cost savings from labor productivity" in the context of the LTC business, but as issues concerning goodwill. As stated in the Form 10-Q filed with the SEC on November 6, 2017:

As previously discussed, the results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%. Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates. Our projected discounted cash flow model assumes future script growth from our senior living initiative and the impact of acquisitions. Such projections also include expected cost savings from labor productivity and other initiatives. Our market multiple method is heavily dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers. If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount.

Page 28 –COMPLAINT

The Form 10-Q did not, in fact, discuss customer losses and the impact of synergies on the Company's financial results.

68.   As with the Form 10-K filed in the previous year, the Form 10-K filed with the SEC on February 14, 2018 focused on the risk of customer losses and failed to disclose data on customer losses up to that point. As stated in the Form 10-K:

*The possibility of client losses and/or the failure to win new business.*

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each year. In some cases, however, PBM clients may negotiate a shorter or longer contract term or may require early or periodic renegotiation of pricing prior to expiration of a contract. Our clients are generally well informed and organized, can move between our competitors and often seek competing bids prior to expiration of their contracts. In addition, the reputational impact of a service-related incident could negatively affect our business. These factors, together with the impact of competitive pressures, could make it difficult for us to attract new clients, retain existing clients and cross-sell additional services. Further, the PBM industry has been affected by consolidation activity that may continue in the future. In the event one or more of our PBM clients is acquired by an entity that is not also our client, we may be unable to retain all or a portion of the acquired business. These circumstances, either individually or in the aggregate, could result in an adverse effect on our business and financial results. Therefore, we continually face challenges in competing for new PBM business and retaining or renewing our existing PBM business. With respect to our LTC business, reimbursement from skilled nursing facilities for prescriptions we dispense is determined pursuant to our agreements with those skilled nursing facilities. The termination of these agreements generally causes our ability to provide services to any of the residents of that facility to cease, resulting in the loss of revenue from any source for those residents. There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms.

Additionally, with respect to our retail and LTC pharmacy businesses, reimbursement under Medicare Part D, as well as reimbursement from certain private third-party payors, is determined pursuant to agreements that we negotiate with those payors or their pharmacy benefit manager representatives. The loss of those agreements, or a material change in the terms of those agreements, could negatively impact the Company. In addition, restricted networks that exclude our retail or specialty pharmacies negatively impact those businesses.

\*      \*      \*

Page 29 –COMPLAINT

***Relationship with our retail and specialty pharmacy customers and the demand for our products and services, including propriety brands.***

The success of our business depends in part on customer loyalty, superior customer service and our ability to persuade customers to frequent our retail stores and online sites and to purchase products in additional categories and our proprietary brands. Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, and evolving demographic mixes in our markets, an inability to expand the products being purchased by our clients and customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our clients and customers and the demand for our products and services and could result in excess inventories of products.

We offer our retail customers proprietary brand products that are available exclusively at our retail stores and through our online retail sites. The sale of proprietary products subjects us to unique risks including potential product liability risks and mandatory or voluntary product recalls, potential supply chain and distribution chain disruptions for raw materials and finished products, our ability to successfully protect our intellectual property rights and the rights of applicable third parties, and other risks generally encountered by entities that source, market and sell private-label products. Any failure to adequately address some or all of these risks could have an adverse effect on our business, results of operations and financial condition. Additionally, an increase in the sales of our proprietary brands may negatively affect our sales of products owned by our suppliers which, consequently, could adversely impact certain of our supplier relationships. Our ability to locate qualified, economically stable suppliers who satisfy our requirements, and to acquire sufficient products in a timely and effective manner, is critical to ensuring, among other things, that customer confidence is not diminished. Any failure to develop sourcing relationships with a broad and deep supplier base could adversely affect our financial performance and erode customer loyalty.

Finally, our specialty pharmacy business focuses on complex and high-cost medications, many of which are made available by manufacturers to a limited number of pharmacies (so-called limited distribution drugs), that serve a relatively limited universe of patients. As a result, the future growth of our specialty pharmacy business is dependent largely upon expanding our base of drugs or penetration in certain treatment categories. Any contraction of our base of patients or reduction in demand for the prescriptions we currently dispense could have an adverse effect on our business, financial condition and results of operations.

While the Form 10-K acknowledges that losing clients could be detrimental to the Company, there is no other discussion of client losses in LTC except in the discussion on goodwill. The Form 10-K states:

As previously discussed, the results of our annual goodwill impairment test resulted in the fair value of our LTC reporting unit exceeding its carrying value by approximately 1%. Our multi-year cash flow projections for our LTC reporting unit have declined from the prior year due to customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates. Our projected discounted cash flow model assumes future script growth from our senior living initiative and the impact of acquisitions. Such projections also include expected cost savings from labor productivity and other initiatives. Our market multiple method is heavily dependent on earnings multiples of market participants in the pharmacy industry, including certain competitors and suppliers. If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below our current expectations in the near term and the LTC reporting unit could be deemed to be impaired by a material amount.

The Form 10-K further states: "The goodwill represents future economic benefits expected to arise from the Company's expanded presence in the pharmaceutical care market, the assembled workforce acquired, expected purchasing and revenue synergies, as well as operating efficiencies and cost savings. . . . Intangible assets acquired include customer relationships and trade names of $3.9 billion and $74 million, respectively, with estimated weighted average useful lives of 19.1 and 2.9 years, respectively, and 18.8 years in total."

69.     The Company's disclosures changed in 2018. In the Form 10-Q filed with the SEC on May 2, 2018, the Company stated:

Our LTC reporting unit continues to face challenges that may affect our ability to grow the business at the rate that we had originally estimated when we made the acquisition of Omnicare and when we performed our prior year annual goodwill impairment test. These challenges include customer reimbursement pressures, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and client retention rates. We recently made a number of additions and changes to our LTC management team to better respond to these challenges. Our financial projections assume future script growth from our senior living initiative, acquisitions, as well as cost savings from labor productivity and other initiatives. . . . If we do not achieve our forecasts, given the small excess of fair value over the related carrying value in the prior year, as well as current market conditions in the healthcare industry, it is reasonably possible that the operational performance of the LTC reporting unit could be below

our current expectations in the near term and the goodwill of the LTC reporting unit could be deemed to be impaired by a material amount.

While the Form 10-Q acknowledges that "client retention rates" are a "challenge," there is no discussion of the data concerning client losses, the impact of synergies on client retention, or how these challenges impact the Company's financial results.

70.    In a press release issued on August 8, 2018 concerning CVS's financial results for the second quarter of 2018, the Company finally admitted that it had a problem retaining customers: "Our LTC business has continued to experience challenges that have impacted our ability to grow the business at the rate that was originally estimated when the Company acquired Omnicare, Inc. in 2015. These challenges include lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures." While the press release acknowledges "lower client retention rates," there is no further information provided on customer losses or synergies. Instead, the press release states that the Company performed a goodwill impairment that "showed that the fair value of the LTC business was lower than the carrying value resulting in a $3.9 billion noncash pre-tax and after-tax goodwill impairment charge."

71.    Similarly, the Form 10-Q filed with the SEC on August 8, 2018 linked "challenges that have impacted management's ability to grow the [LTC] business at the rate that was originally estimated when the Company made the acquisition of Omnicare, Inc. and when the prior year annual goodwill impairment test was performed," such as "lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures" to goodwill. The Company stated that in June 2018, forecasts showed a "deterioration in the financial results [for the LTC business] for the remainder of 2018 and in 2019." There is no discussion of what the

Page 32 –COMPLAINT

deterioration entailed, or how it impacted the Company's financial results. Instead, CVS's management decided to analyze goodwill, which led to a $3.9 billion pre-tax goodwill impairment charge, leaving just $2.7 billion in goodwill for the LTC business. The Form 10-Q notes that challenges like client retention rates and synergies ("the ability to extract cost savings from labor productivity and other initiatives") might further lower the fair value of the LTC business:

> Though we believe the financial projections used to determine the fair value of the LTC reporting unit as of June 30, 2018 are reasonable and achievable, our LTC reporting unit may continue to face challenges that may affect our ability to grow the business at the rate we estimated when we performed such goodwill impairment test. These challenges and some of the key assumptions included in our financial projections to determine the estimated fair value of our LTC reporting unit include client retention rates, occupancy rates in skilled nursing facilities, the financial health of skilled nursing facility customers, facility reimbursement pressures, our ability to execute our senior living initiative, our ability to make acquisitions and integrate those businesses into our LTC operations in an orderly manner, as well as our ability to extract cost savings from labor productivity and other initiatives. We recently made a number of additions and changes to our LTC management team to better respond to these challenges. The estimated fair value of our LTC reporting unit is also dependent on earnings multiples of market participants in the pharmacy industry, as well as the risk-free interest rate environment which impacts the discount rate used in the discounted cash flow method. If we do not achieve our forecasts, given that the fair value and the carrying value of the LTC reporting unit were the same as of June 30, 2018, it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount.

Even so, the Form 10-Q does not disclose the severity of customer losses, the success of the synergies implemented to date, or how the "deterioration" of results in the LTC business have impacted the financial results for the Company.

72.     The Form 10-Q filed with the SEC on November 6, 2018 made similar statements:

> During 2018, the LTC reporting unit has continued to experience challenges that have impacted management's ability to grow the business at the rate that was originally estimated when the Company made the acquisition of Omnicare, Inc. and when the prior year annual goodwill impairment test was performed. These challenges include lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers, and continued facility reimbursement pressures. In June 2018,

Page 33 –COMPLAINT

LTC management submitted their initial budget for 2019 and updated their 2018 annual forecast which showed a deterioration in the financial results for the remainder of 2018 and in 2019, which also caused management to update their long term forecast beyond 2019. Based on these updated projections, management determined that there were indicators that the LTC reporting unit's goodwill may be impaired and, accordingly, an interim goodwill impairment test was performed during the second quarter of 2018. The results of the impairment test showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in a $3.9 billion pre-tax goodwill impairment charge in the second quarter of 2018. The fair value of the LTC reporting unit was determined using a combination of a discounted cash flow method and a market multiple method. In addition to the lower financial projections, higher risk-free interest rates and lower market multiples of the peer group companies contributed to the amount of the goodwill impairment charge. As of September 30, 2018, the remaining goodwill balance in the LTC reporting unit is approximately $2.7 billion.

The Form 10-Q also stated that challenges like client retention rates and synergies ("the ability to extract cost savings from labor productivity and other initiatives") might further lower the fair value of the LTC business:

Though we believe the financial projections used to determine the fair value of the LTC reporting unit in the third quarter of 2018 are reasonable and achievable, our LTC reporting unit may continue to face challenges that may affect our ability to grow the business at the rate we estimated when we performed such goodwill impairment test. These challenges and some of the key assumptions included in our financial projections to determine the estimated fair value of our LTC reporting unit include client retention rates, occupancy rates in skilled nursing facilities, the financial health of skilled nursing facility customers, facility reimbursement pressures, our ability to execute our senior living initiative, our ability to make acquisitions and integrate those businesses into our LTC operations in an orderly manner, as well as our ability to extract cost savings from labor productivity and other initiatives. We recently made a number of additions and changes to our LTC management team to better respond to these challenges. The estimated fair value of our LTC reporting unit is also dependent on earnings multiples of market participants in the pharmacy industry, as well as the risk-free interest rate environment which impacts the discount rate used in the discounted cash flow method. If we do not achieve our forecasts, given that the fair value of the LTC reporting unit only exceeded its carrying value by approximately 2% in the third quarter of 2018, it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount.

C.      **CVS Erases the Remaining Goodwill and the Market Reacts**

73.     Defendants caused the Company to issue financial statements that were false and

misleading. The financial statements failed to disclose the true financial results for the LTC business, and failed to disclose information about customer losses and issues with synergies in the LTC business. The Company focused on goodwill, the excess between fair market value and the purchase price of an asset. Instead of disclosing the LTC business's financial results, the Company opted to use goodwill to make vague assertions about issues with the LTC business's performance. This led to a goodwill impairment charge of $3.9 billion, leaving just $2.7 billion of goodwill associated with the Omnicare assets.

74.     The goodwill impairment analysis that led to the $3.9 billion impairment charge should have been the final charge for the year. Even though the Form 10-Q filed with the SEC on November 6, 2018 stated that there was a reasonable possibility that the LTC business's goodwill could be impaired again, the fair value of the LTC business was determined using a discounted cash flow analysis, which utilizes forecasts created by management. Another impairment charge would mean that management's forecasts for the LTC business's performance could not be trusted.

75.     On February 20, 2019, the Company issued a press release disclosing financial results for the fourth quarter and full year 2018. The press release noted that there was a decrease in operating income and, ultimately, a net loss, both "primarily due to the goodwill impairment charges in the Retail/LTC segment." The Company stated:

> The LTC business has continued to experience industry wide challenges that have impacted our ability to grow the business at the rate that was originally estimated when the Company acquired Omnicare, Inc. in 2015. These challenges include lower occupancy rates in skilled nursing facilities, significant deterioration in the financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures. As a result of these challenges, a goodwill impairment charge of $3.9 billion was recorded during the second quarter of 2018. During the fourth quarter of 2018, the LTC reporting unit missed its forecast primarily due to operational issues and customer liquidity issues, including one significant customer bankruptcy. Additionally, LTC management submitted an updated final budget for 2019 which showed significant additional deterioration in the reporting unit's

Page 35 –COMPLAINT

projected financial results for 2019 compared to the analysis performed in the second quarter of 2018, primarily due to continued industry and operational challenges, which also caused management to make further updates to their long term forecast beyond 2019. Based on these updated financial projections, management determined that there were indicators that the goodwill of the LTC business may be further impaired, and accordingly, an interim goodwill impairment test was performed as of December 31, 2018. The results of the impairment test showed that the fair value of the LTC business was lower than the carrying value resulting in a $2.2 billion goodwill impairment charge. In addition to the lower financial projections, lower market multiples of the peer group companies contributed to the amount of the goodwill impairment charge.

The $2.2 billion impairment charge lowered the goodwill from the Omnicare acquisition to approximately $431 million, a 95% drop from the $9 billion CVS determined that it had obtained when it acquired Omnicare.

76.    The closing stock price for CVS dropped from $64.22 per share at close on February 20, 2019 to close at $61.95 per share on February 22, 2019.

77.    The Company filed a Form 10-K with the SEC on February 28, 2019 that expanded on the information provided in the February 20, 2019 press release. For the first time, the Company disclosed risks related to the LTC business's ability to retain clients. For example, the Form 10-K stated:

The competitive success of our LTC pharmacy operations is dependent upon our ability to compete in each geographic region where we have operations. In the geographic regions we serve, we compete with PharMerica, our largest LTC pharmacy competitor, as well as with numerous local and regional institutional pharmacies, pharmacies owned by long-term care facilities and local retail pharmacies. Our LTC pharmacy customers consist of skilled nursing facilities, assisted living facilities, independent living communities, hospitals, correctional facilities, and other health care service providers. One of our growth opportunities is to increase our penetration rate in the assisted living segment, where residents can choose which pharmacy will provide them with prescription drugs. The ability of a resident of an assisted living facility to select the pharmacy that supplies him or her with prescription drugs could adversely affect our business, financial condition and results of operations because there can be no assurance that such resident will select us.

The Form 10-K also states:

Page 36 –COMPLAINT

> *We may lose clients and/or fail to win new business. If we fail to compete effectively in the geographies and product areas in which we operate, including maintaining or increasing membership in our Health Care Benefits segment, our results of operations, financial condition and cash flows could be materially and adversely affected.*

<div align="center">*     *     *</div>

> With respect to our LTC pharmacy business, reimbursement from skilled nursing facilities for prescriptions we dispense is determined pursuant to our agreements with those skilled nursing facilities. The termination of these agreements generally terminates our ability to provide services to any of the residents of that facility, resulting in the loss of revenue from any source for those residents. There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms. Additionally, with respect to our retail and LTC pharmacy businesses, reimbursement under Medicare Part D, as well as reimbursement from certain private third-party payors, is determined pursuant to agreements that we negotiate with those payors or their PBM representatives. The loss of those agreements, or a material change in the terms of those agreements, could adversely affect our results of operations and cash flows. In addition, restricted networks that exclude our retail or specialty pharmacies adversely affect those businesses.

Still, the Form 10-K doesn't disclose the impact of the LTC business operations on the Company's financial results. The Form 10-K notes:

> Pharmacy revenue growth has been adversely affected by industry challenges in the LTC business, such as continuing lower occupancy rates at skilled nursing facilities, as well as the deteriorating financial health of many skilled nursing facilities which resulted in a number of customer bankruptcies in 2018. Pharmacy revenue in 2018 continued to benefit from the Company's ability to attract and retain managed care customers and the increased use of pharmaceuticals by an aging population as the first line of defense for health care.

However, there is no discussion of the financial impact of customer losses or synergies in the LTC business. The closest statement involves goodwill. The Form 10-K noted:

> [D]uring 2018, the LTC reporting unit continued to experience industry wide challenges that have impacted management's ability to grow the business at the rate that was originally estimated when the Company acquired Omnicare and when the 2017 annual goodwill impairment test was performed. These challenges include lower client retention rates, lower occupancy rates in skilled nursing facilities, the deteriorating financial health of numerous skilled nursing facility customers which resulted in a number of customer bankruptcies in 2018, and continued facility reimbursement pressures. In June 2018, LTC management submitted its initial

Page 37 –COMPLAINT

budget for 2019 and updated the 2018 annual forecast which showed a projected deterioration in the financial results for the remainder of 2018 and in 2019, which also caused management to update its long-term forecast beyond 2019. Based on these updated projections, management determined that there were indicators that the LTC reporting unit's goodwill may be impaired and, accordingly, management performed an interim goodwill impairment test as of June 30, 2018. The results of that interim impairment test showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in a $3.9 billion pre-tax goodwill impairment charge in the second quarter of 2018. The fair value of the LTC reporting unit was determined using a combination of a discounted cash flow method and a market multiple method. In addition to the lower financial projections, higher risk-free interest rates and lower market multiples of peer group companies contributed to the amount of the second quarter 2018 goodwill impairment charge.

During the third quarter of 2018, the Company performed its required annual impairment tests of goodwill. The results of these impairment tests indicated that there was no impairment of goodwill. The results of the annual goodwill impairment tests showed the fair values of the Pharmacy Services and Retail Pharmacy reporting units exceeded their carrying values by significant margins and the fair value of the LTC reporting unit exceeded its carrying value by approximately 2%.

During the fourth quarter of 2018, the LTC reporting unit missed its forecast primarily due to operational issues and customer liquidity issues, including one significant customer bankruptcy. Additionally, LTC management submitted an updated final budget for 2019 which showed significant additional deterioration in the projected financial results for 2019 compared to the analyses performed in the second and third quarters of 2018 primarily due to continued industry and operational challenges, which also caused management to make further updates to its long-term forecast beyond 2019. The updated projections continue to reflect industry wide challenges including lower occupancy rates in skilled nursing facilities, the significant deterioration in the financial health of numerous skilled nursing facility customers and continued facility reimbursement pressures. Based on these updated projections, management determined that there were indicators that the LTC reporting unit's goodwill may be impaired and, accordingly, an interim goodwill impairment test was performed during the fourth quarter of 2018. The results of that impairment test showed that the fair value of the LTC reporting unit was lower than the carrying value, resulting in an additional $2.2 billion goodwill impairment charge in the fourth quarter of 2018. In addition to the lower financial projections, lower market multiples of peer group companies also contributed to the amount of the fourth quarter 2018 goodwill impairment charge. The fair value of the LTC reporting unit was determined using a methodology consistent with the methodology described above for the analyses performed during the second and third quarters of 2018.

As of December 31, 2018, the remaining goodwill balance in the LTC reporting unit is approximately $431 million.

Although the Company believes the financial projections used to determine the fair value of the LTC reporting unit in the fourth quarter of 2018 are reasonable and achievable, the LTC reporting unit may continue to face challenges that may affect the Company's ability to grow its business at the rate estimated when such goodwill impairment test was performed. These challenges and some of the key assumptions included in the Company's financial projections to determine the estimated fair value of the LTC reporting unit include client retention rates, occupancy rates in skilled nursing facilities, the financial health of skilled nursing facility customers, facility reimbursement pressures, the Company's ability to execute its senior living initiative, the Company's ability to make acquisitions and integrate those businesses into its LTC operations in an orderly manner, as well as the Company's ability to extract cost savings from labor productivity and other initiatives. The Company has made a number of additions and changes to its LTC management team to better respond to these challenges. The estimated fair value of the LTC reporting unit also is dependent on earnings multiples of market participants in the pharmacy industry, as well as the risk-free interest rate environment, which impacts the discount rate used in the discounted cash flow valuation method. If the Company does not achieve its forecasts, it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount.

78.     CVS's false and misleading statements have damaged the company. The closing stock price for CVS dropped from a closing price of $57.83 on February 28, 2019 to close at $54.00 on March 6, 2019. Between January 2, 2018 and March 6, 2019, CVS's stock dropped 26.5%, a loss of $25.3 billion in market share. In addition, the false and misleading statements have subjected CVS to two securities class actions, *Anarkat v. CVS Health Corp. et al*, Case No. 1:19-cv-00437 (D.R.I.) and *Waterford Township Police & Fire Ret. Sys. v. CVS Health Corporation et al*, Case No. 1:19-cv-00434 (D.R.I.), that assert that statements made between February 9, 2016 and February 20, 2019 were false and misleading and/or failed to disclose the performance of the LTC business. The lawsuits expose CVS to millions of dollars in legal fees and potential damages. Finally, the misconduct has damaged CVS's credibility and reputation.

**D.     CVS Issues False and Misleading Proxy Statements**

79.     In addition to the false and misleading statements discussed above, Defendants

Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White also caused the Company to issue false and misleading proxy statements during the Relevant Period. The Schedule 14A Proxy Statements issued on April 8, 2016, March 31, 2017, and April 24, 2018 (collectively the "Proxies") that sought stockholder votes to, among other things, re-elect the Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White to serve on the Board.

80.      Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White drafted, approved, reviewed, and/or signed the Proxies before they were filed with the SEC and disseminated to CVS's stockholders. Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White negligently issued materially misleading statements in the Proxies. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White, and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

81.      In support of re-electing themselves, Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Swift, Weldon, White highlighted their supposed oversight of the Company. The Schedule 14A Proxy Statement filed with the SEC on April 8, 2016 (the "2016 Proxy") stated:

**The Board's Role in Risk Oversight**

The Board's role in risk oversight involves both the full Board and its Committees. The Audit Committee is charged with the primary role in carrying out risk oversight

responsibilities on behalf of the Board. Pursuant to its charter, the Audit Committee annually reviews our policies and practices with respect to risk assessment and risk management, including discussing with management the Company's major risk exposures and the steps that have been taken to monitor and mitigate such exposures. As part of CVS Health's ongoing Enterprise Risk Management process, each of our major business units is responsible for identifying risks that could affect achievement of business goals and strategies, assessing the likelihood and potential impact of significant risks, prioritizing risks and actions to be taken in mitigation and/or response, and reporting to management's Executive Risk Steering Committee on actions to monitor, manage and mitigate significant risks. Additionally, the Chief Financial Officer ("CFO"), Chief Compliance Officer ("CCO") and General Counsel periodically report on the Company's risk management policies and practices to relevant Board Committees and to the full Board. The Audit Committee reviews CVS Health's major financial risk exposures as well as major operational, compliance, reputational and strategic risks, including developing steps to monitor, manage and mitigate those risks. In addition, each of the other Board Committees is responsible for oversight of risk management practices for categories of risks relevant to their functions. For example, the Management Planning and Development Committee has oversight responsibility for our overall compensation structure, including review of its compensation practices, with a view to assessing associated risk. The Board is regularly updated on specific risks in the course of its review of corporate strategy, business plans and reports to the Board by its respective Committees.

The Board considers its role in risk oversight when evaluating our Corporate Governance Guidelines and its leadership structure. Both the Corporate Governance Guidelines and the Board's leadership structure facilitate the Board's oversight of risk and communication with management. Our independent Chairman and our CEO are focused on CVS Health's risk management efforts and ensure that risk matters are appropriately brought to the Board and/or its Committees for their review.

82.    In support of re-electing themselves, Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Swift, Weldon, and White highlighted their supposed oversight of the Company. The Schedule 14A Proxy Statement filed with the SEC on March 31, 2017 (the "2017 Proxy") stated:

**The Board's Role in Risk Oversight**

The Board's role in risk oversight involves both the full Board and its Committees, as well as members of management.

- The Audit Committee is charged with the primary role in carrying out risk oversight responsibilities on behalf of the Board. Pursuant to its charter, the Audit Committee annually reviews our policies and practices with respect

to risk assessment and risk management, including discussing with management the Company's major risk exposures and the steps that have been taken to monitor and mitigate such exposures. The Audit Committee also reviews CVS Health's major financial risk exposures as well as major operational, compliance, reputational and strategic risks, including developing steps to monitor, manage and mitigate those risks.

- Each of our other Board Committees is responsible for oversight of risk management practices for categories of risks relevant to their functions. For example, the Management Planning and Development Committee has oversight responsibility for our overall compensation structure, including review of its compensation practices, with a view to assessing associated risk. See "Compensation Risk Assessment" on page 26 for additional information.

- As part of CVS Health's ongoing Enterprise Risk Management process, each of our major business units is responsible for identifying risks that could affect achievement of business goals and strategies, assessing the likelihood and potential impact of significant risks, prioritizing risks and actions to be taken in mitigation and/ or response, and reporting to management's Executive Risk Steering Committee on actions to monitor, manage and mitigate significant risks.

- Additionally, the CFO, Chief Compliance Officer and General Counsel periodically report on the Company's risk management policies and practices to relevant Board Committees and to the full Board. The Board is regularly updated on specific risks in the course of its review of corporate strategy, business plans and reports to the Board by its respective Committees

The Board considers its role in risk oversight when evaluating our Corporate Governance Guidelines and its leadership structure. Both the Corporate Governance Guidelines and the Board's leadership structure facilitate the Board's oversight of risk and communication with management. Our independent Chairman and our CEO are focused on CVS Health's risk management efforts and ensure that risk matters are appropriately brought to the Board and/or its Committees for their review.

83.   In support of re-electing themselves, Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White highlighted their supposed oversight of the Company. The Schedule 14A Proxy Statement filed with the SEC on April 24, 2018 (the "2018 Proxy") stated:

**The Board's Role in Risk Oversight**

Page 42 –COMPLAINT

The Board's role in risk oversight involves both the full Board and its Committees, as well as members of management.

**Risk Oversight Framework**

**Board of Directors**

- Focuses on understanding Company-wide risks and ensuring that risk matters are appropriately brought to the Board and/or its Committees for review.

- Ensures that the Corporate Governance Guidelines and the Board's leadership structure facilitate the effective oversight of risk and communication with management.

**Board Committees**

Each of our principal Board Committees is responsible for oversight of risk management practices for categories of risks relevant to their functions.

**Audit Committee**

Primary committee charged with carrying out risk oversight responsibilities on behalf of the Board, including reviewing financial, operational, compliance, reputational and strategic risks.

| **Management Planning and Development Committee** | **Nominating and Corporate Governance Committee** | **Patient Safety and Clinical Quality Committee** |
|---|---|---|

**Management**

- Each major business unit is responsible for identifying risks, assessing the likelihood and potential impact of significant risks, and reporting to management's Executive Risk Steering Committee on actions to monitor, manage and mitigate significant risks.

- The CFO, Chief Compliance Officer and General Counsel periodically report on the Company's risk management policies and practices to relevant Board Committees and to the full Board.

- The Audit Committee is charged with the primary role in carrying out risk oversight responsibilities on behalf of the Board. Pursuant to its charter, the Audit Committee annually reviews our policies and practices with respect

Page 43 –COMPLAINT

to risk assessment and risk management, including discussing with management the Company's major risk exposures and the steps that have been taken to monitor and mitigate such exposures. The Audit Committee also reviews CVS Health's major financial risk exposures as well as major operational, compliance, cybersecurity, reputational and strategic risks, including developing steps to monitor, manage and mitigate those risks.

- Each of our other Board Committees is responsible for oversight of risk management practices for categories of risks relevant to their functions. For example, the Management Planning and Development Committee has oversight responsibility for our overall compensation structure, including review of its compensation practices, with a view to assessing associated risk. See "Compensation Risk Assessment" on page 25 for additional information.

- As part of CVS Health's ongoing Enterprise Risk Management process, each of our major business units is responsible for identifying risks that could affect achievement of business goals and strategies, assessing the likelihood and potential impact of significant risks, prioritizing risks and actions to be taken in mitigation and/or response, and reporting to management's Executive Risk Steering Committee on actions to monitor, manage and mitigate significant risks.

- Additionally, the CFO, Chief Compliance Officer and General Counsel periodically report on the Company's risk management policies and practices to relevant Board Committees and to the full Board. The Board is regularly updated on specific risks in the course of its review of corporate strategy, business plans and reports to the Board by its respective Committees.

The Board considers its role in risk oversight when evaluating our Corporate Governance Guidelines and its leadership structure. Both the Corporate Governance Guidelines and the Board's leadership structure facilitate the Board's oversight of risk and communication with management. Our independent Chairman and our CEO are focused on CVS Health's risk management efforts and ensure that risk matters are appropriately brought to the Board and/or its Committees for their review.

84. The Proxies thus assured stockholders that Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White understood Company-wide risks, actively oversaw the Company's risks and exposures and steps taken to monitor and mitigate risk exposures. In reality, Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White

Page 44 – COMPLAINT

1   were utterly failing in their oversight duties by allowing the Company to operate with inadequate

2   internal controls which resulted in the failure to disclose or prevent the Defendants from causing

3   the Company to make materially false and misleading statements concerning the LTC business's

4   financial performance, customer losses, synergies and the impact of the LTC business's financial

5   performance on the Company's financial results.

6       85.     As a result of these misleading statements, the Company's stockholders voted via

7   an uninformed stockholder vote to re-elect Defendants Bracken, Brown, DeCoudreaux, DeParle,

8   Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White to the Board.

9   **E.      The Board Breached its Fiduciary Duties**

10      86.     As officers and/or directors of CVS, the Defendants owed CVS fiduciary duties of

11  good faith, loyalty, and candor, and were and are required to use their utmost ability to control and

12  manage CVS in a fair, just, honest and equitable manner. The conduct of the Director Defendants

13  involves a knowing or reckless violation of their obligations as directors and officers of CVS, the

14  absence of good faith on their part, and a reckless disregard for their duties to the Company that

15  Director Defendants were aware or should have been aware posed a risk of serious injury to the

16  Company.

17      87.     Defendants, because of their positions of control and authority as directors and/or

18  officers of CVS, were able to and did exercise control over the wrongful acts complained of herein.

19  As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent

20  the dissemination of inaccurate and untruthful information regarding CVS's financial condition,

21  performance, growth, operations, financial statements, business, management, earnings, internal

22  controls, and business prospects, so as to ensure that the market price of the Company's common

23

24  Page 45 –COMPLAINT

stock would be based upon truthful and accurate information.

88.     To discharge their duties, the officers and directors of CVS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and CVS were required to, among other things:

a.  Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

b.  Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.  Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.  Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.  Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions

or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

f.  Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

89.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

90.    CVS maintains a Code of Conduct that applies to directors, officers and all other employees of CVS. The Code of Conduct states:

CVS Health is committed to upholding the highest ethical standards and complying with applicable laws and regulations, federal health care program requirements, this Code and any other Company policies or requirements.

\*        \*        \*

The Sarbanes-Oxley Act of 2002 (SOX) requires certain Company leaders to certify to the truth and accuracy of Company financial statements. SOX also mandates that we maintain appropriate financial controls, report significant fraud and keep detailed and accurate records of all of our business operations. We will maintain books, records and accounts that accurately reflect the business transactions and assets of CVS Health®. If you have a role in public financial communications, make sure disclosures are full, fair, accurate, timely and understandable.

\*        \*        \*

All colleagues must:

Page 47 –COMPLAINT

- Understand and follow the Code and Company policies and procedures.

- Conduct your work and professional activities ethically and in accordance with all applicable laws, regulations, Federal health care program requirements, corporate integrity agreements and court orders.

<div align="center">*     *     *</div>

Leadership Responsibilities

While setting the tone at the top, CVS Health leadership must "walk the talk" and demonstrate the Company's values in all of their dealings on its behalf. CVS Health leaders are responsible for making strategic business decisions that align with our ethical standards and with this Code.

CVS Health leaders, including Managers and Supervisors, must also be knowledgeable about the content and operation of the Compliance and Integrity Program. The leadership team plays an important role in building integrity, respect, credibility and long-term sustainability for the Company.

Because leadership sets an example for all colleagues, they must:

- Maintain a positive, ethical work environment;

- Make certain that colleagues understand what is expected of them both professionally and ethically;

- Maintain an open door policy on a routine basis for colleagues to ask questions and raise concerns;

- Address issues raised by colleagues by listening and taking action, when appropriate;

- Ensure colleagues complete all training in a timely manner;

- Address all reports of misconduct and never ignore misconduct or retaliation;

- Reinforce this Code with colleagues;

- Communicate all policies and procedures;

- Be fair and objective; and

- Be a positive role model.

Financial Leaders

Financial leaders have special responsibilities related to Sarbanes-Oxley requirements. They must establish, maintain and periodically certify the adequacy of internal controls for financial reporting. These leaders are also responsible for reporting material deficiencies or weaknesses in the Company's internal controls.

91.     The Board's Audit Committee is tasked with assisting the Board in its oversight of the integrity of the Company's financial statements, the performance of internal audits, and the Company's compliance program. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- The Committee shall discuss with the independent auditor its responsibilities under generally accepted auditing standards, review and approve the scope and staffing of the independent auditor's annual audit plan(s), with emphasis on accounting and financial areas where the Committee, management, or the accountants believe special attention should be directed, and discuss any significant findings from the audit, including any problems or difficulties encountered.

- At least annually, the Committee shall review the annual internal audit plan with the senior officer or officers responsible for the internal audit function of the Company. The review shall focus on the scope and effectiveness of internal audit activities and the department's capability to fulfill its objectives.

- As appropriate, the Committee shall meet to review and discuss with management, the internal auditors and the independent auditor, in separate meetings, if the Committee deems it necessary:

    o  the annual audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-K;

    o  the quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", prior to the filing of the Company's Form 10-Q;

    o  analyses or other written communications prepared by management and/or the independent auditor setting forth significant judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements and estimates made by management having a material impact on

Page 49 –COMPLAINT

the financial statements;

o   the critical accounting policies and practices of the Company;

o   off-balance sheet transactions and structures;

o   any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

o   significant variations in financial information between reporting periods; and

o   the effect of regulatory and accounting initiatives or actions applicable to the Company (including any SEC investigations or proceedings)and any significant accounting, reporting, regulatory and other developments affecting the Company's annual and quarterly financial statements, related footnotes and related disclosures.

•   The Committee shall, in conjunction with the Chief Executive Officer (the "CEO") and CFO of the Company, at least annually review and approve the Company's disclosure controls and procedures and also review the Company's internal controls over financial reporting. The review of internal controls over financial reporting shall include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting. The Committee shall also review any special audit steps adopted in light of material control deficiencies.

•   The Committee shall periodically review and approve and shall oversee compliance with the Company's Code of Conduct and report on such compliance to the Board. The Committee shall also review and consider any requests for waivers of the Company's Code of Conduct for the Company's directors, executive officers and other senior financial officers, and shall make a recommendation to the Board with respect to such request for a waiver.

92.   In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Aguirre, DeCoudreaux, Ludwig, Millon, Schapiro and Swift conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete

failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

93.     In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

94.     The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their company's Code of Ethics and Audit Committee Charter have inflicted, and will continue to inflict, significant harm on CVS.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of CVS to redress injuries suffered by CVS as a direct result of the Director Defendants' breaches of fiduciary duty. CVS is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff will adequately and fairly represent the interests of CVS in enforcing and prosecuting the Company's rights.

97.     Plaintiff was a stockholder of CVS at the time of the wrongdoing complained of,

Page 51 –COMPLAINT

1   has continuously been a stockholder since that time, and is currently a CVS stockholder.

2   <center>**DEMAND FUTILITY ALLEGATIONS**</center>

3   98.    Plaintiff repeats, re-alleges, and incorporates by reference each and every

4   allegations set forth as though fully set forth herein.

5   99.    The CVS Board currently has 16 members: Defendants Aguirre, Bertolini,

6   Bracken, Brown, DeCoudreaux, DeParle, Dorman, Farah, Finucane, Ludwig, Merlo, Millon,

7   Schapiro, Swift, Weldon and White.

8   100.    Plaintiff has not made any demand on CVS's current Board to institute this action

9   against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable

10  of making an independent and disinterested decision to institute and vigorously prosecute this

11  action.

12  **1.  Director Defendants Face a Substantial Likelihood of Liability**

13  101.    As alleged above, Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman,

14  Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White breached their fiduciary duties by

15  negligently issuing the materially false and misleading Proxies soliciting the reelection of

16  themselves to the Board. Accordingly, Defendants Bracken, Brown, DeCoudreaux, DeParle,

17  Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White face a substantial

18  likelihood of negligence liability for issuing the Proxies and any demand upon these defendants is

19  therefore futile.

20  102.    The Director Defendants face a substantial likelihood of liability for their individual

21  misconduct. As alleged above, the Director Defendants breached their fiduciary duties by allowing

22  the Company to issue the materially false and misleading statements described above. The Director

23  Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public

24  Page 52 –COMPLAINT

1  statements and presentations concerning its business, operations, prospects, internal controls, and

2  financial statements were accurate.

3      103.   In addition, the Director Defendants owed a duty to, in good faith and with due

4  diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's

5  internal controls were sufficiently robust and effective (and/or were being implemented

6  effectively), and to ensure that the Board's duties were being discharged in good faith and with

7  the required diligence and due care. Instead, the Director Defendants knowingly and/or with

8  reckless disregard reviewed, authorized, and/or caused the publication of the materially false and

9  misleading statements discussed above that caused the Company's stock to trade at artificially

10 inflated prices and misrepresented the financial health of CVS.

11     104.   The Director Defendants' making or authorization of these false and misleading

12 statements, failure to timely correct such statements, failure to take necessary and appropriate steps

13 to ensure that the Company's internal controls were sufficiently robust and effective (and/or were

14 being implemented effectively), and failure to take necessary and appropriate steps to ensure that

15 the Board's duties were being discharged in good faith and with the required due diligence

16 constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a

17 substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of CVS

18 to recover damages sustained as a result of this misconduct, they would expose themselves and

19 their colleagues to significant liability. For this reason, demand is futile as to the Director

20 Defendants.

21     **2.  Defendants Merlo and Bertolini Lack Independence Because of their Roles at CVS**

22

23     105.   As CEO of CVS Defendant Merlo depends upon his position for his livelihood and

thus is not independent, as supported by CVS's identifying him as not being independent.

24

Defendant Bertolini is also identified by CVS as not being independent. Therefore, Defendants Merlo and Bertolini cannot independently consider any demand.

### 3. Defendants Aguirre DeCoudreaux, Ludwig, Millon, Schapiro and Swift are not Disinterested Because They Were Members of the Audit Committee

106.    The Audit Committee assists the Board with its oversight of the Company's financial statements, the performance of the Company's internal audit function and the Company's compliance program. One of the Audit Committee's responsibilities is to review the Company's annual audited financial statements, quarterly financial statements, analyses or other written communications prepared by management in connection with the financial statements, and the critical accounting policies and practices of the Company. The Audit Committee was thus responsible for reviewing and approving CVS's earnings releases, which include the press releases, Forms 10-Q and 10-K filed between February 9, 2016 and February 28, 2019. Defendants Aguirre, DeCoudreaux, Ludwig, Millon, Schapiro and Swift were members of the Audit Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Aguirre, DeCoudreaux, Ludwig, Millon, Schapiro and Swift caused improper statements by the Company. Accordingly, Defendants Aguirre, DeCoudreaux, Ludwig, Millon, Schapiro and Swift breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

107.    Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct

and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against the Director Defendants)

108.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

109.    Each of the Defendants owed and owes CVS the highest obligations of loyalty, good faith, candor, and oversight.

110.    Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

111.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

112.    In addition, the Director Defendants further breached their fiduciary duties owed to CVS by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose the financial performance of the LTC business, the extent of client losses and the impact of synergies on client retention and the LTC business's performance. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the

1   Company for breaching their fiduciary duties.

2       113.    The Director Defendants had actual or constructive knowledge that they had caused

3   the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain

4   adequate internal controls. The Director Defendants had actual knowledge that the Company was

5   engaging in the wrongdoing set forth herein, and that internal controls were not adequately

6   maintained, or acted with reckless disregard for the truth, in that they caused the Company to

7   improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even

8   though such facts were available to them. Such improper conduct was committed knowingly or

9   recklessly and for the purpose and effect of artificially inflating the price of the Company's

10  securities. The Director Defendants, in good faith, should have taken appropriate action to correct

11  the schemes alleged herein and to prevent them from continuing to occur.

12      114.    As a direct and proximate result of the breaches of duty alleged herein, CVS has

13  sustained and will sustain significant damages.

14      115.    As a result of the misconduct alleged herein, these Defendants are liable to the

15  Company.

16      116.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

17                              **COUNT II**
                          **Breach of Fiduciary Duty**
18  **(Derivatively Against Defendants Merlo, Denton, Roberts, Kraft and Boratto)**

19      117.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

20  herein.

21      118.    Defendants Merlo, Denton, Roberts, Kraft and Boratto are executive officers of the

22  Company. As executive officers, Defendants Merlo, Denton, Roberts, Kraft and Boratto owed and

23

24
    Page 56 –COMPLAINT

1  owe CVS the highest obligations of loyalty, good faith, due care, oversight, and candor.

2      119.    Defendants Merlo, Denton, Roberts, Kraft and Boratto breached their fiduciary

3  duties owed to CVS by willfully or recklessly making and/or causing the Company to make false

4  and misleading statements and omissions of material fact, failing to disclose the financial

5  performance of the LTC business, the extent of client losses and the impact of synergies on client

6  retention and the LTC business's performance. Defendants Merlo, Denton, Roberts, Kraft and

7  Boratto failed to correct and cause the Company to fail to rectify any of the wrongs described

8  herein or correct the false and misleading statements and omissions of material fact.

9      120.    As a direct and proximate result of the breaches of duty alleged herein, CVS has

10 sustained and will sustain significant damages.

11     121.    As a result of the misconduct alleged herein, Defendants Merlo, Denton, Roberts,

12 Kraft and Boratto are liable to the Company.

13     122.    Plaintiff, on behalf of CVS, has no adequate remedy at law.

14                            **COUNT III**
                 **Violation of Section 14(a) of the Exchange Act**
15 **(Against Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo,**
                 **Millon, Schapiro, Swift, Weldon, and White)**
16

17     123.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

18 herein.

19     124.    The section 14(a) Exchange Act claims alleged herein are based solely on

20 negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf

21 of Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon,

22 Schapiro, Swift, Weldon, and White. The section 14(a) Exchange Act claims detailed herein do

23 not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance

24 upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard

Page 57 –COMPLAINT

to the nonfraud claims.

125.   Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2016, 2017 and 2018 Proxies. In the Proxies, the Board solicited stockholder votes to reelect Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White to the Board.

126.   The Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, CVS misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White.

127.   Plaintiff, on behalf of CVS, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of Defendants Bracken, Brown, DeCoudreaux, DeParle, Dorman, Finucane, Merlo, Millon, Schapiro, Swift, Weldon, and White to the Board.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment as follows:

Page 58 –COMPLAINT

1    A.    Declaring that Plaintiff may maintain this derivative action on behalf of CVS and

2 that Plaintiff is a proper and adequate representative of the Company;

3    B.    Against all of the Defendants and in favor of CVS for the amount of damages

4 sustained by the Company as a result of the acts and transactions complained of herein;

5    C.    Granting appropriate equitable relief to remedy the Defendants' breaches of

6 fiduciary duties, including, but not limited to the institution of appropriate corporate governance

7 measures;

8    D.    Awarding CVS restitution from Defendants, and each of them, and ordering

9 disgorgement of all profits, benefits and other compensation obtained by Defendants;

10    E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

11 attorneys' and expert fees and expenses; and

12    F.    Granting such other and further equitable relief as this Court may deem just and

13 proper.

14                            **JURY DEMAND**

15       Plaintiff demands a trial by jury.

16    Dated: January 16, 2020

17 **HIGGINS, CAVANAGH & COONEY, LLP**

18

19 Stephen P. Cooney (#      )  4803
10 Dorrance Street, Suite 400
20 Providence, RI 02903
Telephone: (401) 272-3500
21 Facsimile:  (401) 273-8780
Email:  scooney@hcc-law.com

22

23    *Attorneys for Plaintiff*

24

Page 59 –COMPLAINT

1

2

3       **ROWLEY LAW PLLC**
        Shane T. Rowley, Esq.
4       Danielle Rowland Lindahl, Esq.
        50 Main Street, Suite 1000
5       White Plains, New York 10606
        Phone: (914) 400-1920
6       Fax: (914) 301-3514
        Email: srowley@rowleylawpllc.com
7                  drl@rowleylawpllc.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## VERIFICATION

I, Gerald Joseph Lovoi, am the named plaintiff in the above-titled action. I have read the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorized its filing. The contents alleged therein are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true. I further declare that I am a current holder, and have been a holder, of CVS Health Corporation common stock during the time period in which the wrongful conduct alleged and complained of occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of November, 2019.

Gerald Joseph Lovoi